## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RHONDA NITTO, and DONALD KRIST, on behalf of themselves and all others similarly situated, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | Case No. 1:23-cv-13998-SJC |
| CVS PHARMACY, INC., | |
| Defendant. | |

Plaintiffs, Rhonda Nitto, and Donald Krist, on behalf of themselves and all others similarly situated, bring this class action against Defendant CVS Pharmacy, Inc. ("CVS"), and allege on personal knowledge, investigation of counsel, and on information and belief as follows:

## <u>GENERAL ALLEGATIONS</u>

1. CVS offers a variety of over-the-counter drugs, including oral nasal decongestants, competing in a billion-dollar industry. Twelve such products are the over-the-counter oral nasal decongestants and pain relievers/fever reducers: CVS Health Non-Drowsy Nasal Decongestant PE; Severe Congestion & Cough Relief; Severe Cough & Congestion Relief; Sinus PE + Allergy; Daytime and Nighttime Severe Cold/Flu Relief; Mucus Relief Sinus Severe Congestion & Pain; Daytime and Nighttime Sinus Relief; Congestion & Headache; Cold, Flu & Sore Throat; Severe Allergy & Sinus Headache; Multi-Symptom Cold Relief; and Sinus PE Pressure + Pain (collectively, "Products" or "CVS PE Products").

2. All of the Products are oral phenylephrine hydrochloride ("PE") nasal decongestant softgels, caplets, and syrups/liquids, some contain acetaminophen as another active ingredient, and

1

all of the Products are marketed as "MAXIMUM STRENGTH" ("Maximum Strength Representation").

3.      When consumers purchase decongestants and pain relief/fever reducer products, the strength of the ingredients is an important purchasing consideration, especially for consumers seeking a maximum strength product.

4.      CVS takes advantage of this consumer preference for strong relief by prominently representing the alleged strength of the Products in the one place every consumer looks when purchasing a product—the front packaging.

5.      On each product package for the Products, CVS uniformly touts in capitalized font set against a contrasting color background on the front of the package that the Products provide maximum strength relief.[1]

6.      For example, the CVS Health Non-Drowsy Nasal Decongestant PE, Severe Congestion & Cough Relief, Severe Cough & Congestion Relief, and Sinus PE + Allergy products have the following labels:[2]

---

[1] Based upon reasonable investigation, Plaintiffs have identified certain Products that contain PE, and at times, acetaminophen, and are also labeled as "MAXIMUM STRENGTH." The complete list of Products is in the exclusive control of CVS and will be the subject of discovery. Products include all substantially similar CVS PE products, including all forms (i.e., softgels, syrup/liquid, caplets, tablets, capsules, etc.) for all substantially similar CVS PE products, manufactured, marketed, and sold during the relevant class periods, that contained PE and acetaminophen were labeled as "MAXIMUM STRENGTH" or another synonymous Maximum Strength Representation.

[2] All of the Product photographs contained herein encompass online publicly available labels and packaging. Discovery from Defendant will determine the complete set of relevant product labels and packaging.









**Drug Facts**

| Active ingredients (in each 20 mL) | Purpose |
|---|---|
| Dextromethorphan HBr 20 mg | Cough suppressant |
| Guaifenesin 400 mg | Expectorant |
| Phenylephrine HCl 10 mg | Nasal decongestant |

**Uses**
- helps loosen phlegm (mucus) and thin bronchial secretions to rid the bronchial passageways of bothersome mucus and make coughs more productive
- temporarily relieves:
  - cough due to minor throat and bronchial irritation as may occur with the common cold or inhaled irritants
  - the intensity of coughing
  - the impulse to cough to help you get to sleep
  - nasal congestion due to a cold ➤

5



## ♥CVSHealth.

# Sinus PE + Allergy

**CHLORPHENIRAMINE MALEATE** - Antihistamine
**PHENYLEPHRINE HYDROCHLORIDE** - Nasal decongestant

## MAXIMUM STRENGTH

**Relieves:**
- Sinus pressure & Congestion
- Sneezing
- Itchy eyes
- Runny nose

**24** TABLETS UNCOATED

Actual Size

---

### Drug Facts

**KEEP OUTER PACKAGE FOR COMPLETE PRODUCT INFORMATION**

**Active ingredients** (in each tablet) — **Purpose**
Chlorpheniramine maleate 4 mg . . . . . . . . . . . . . . . . . Antihistamine
Phenylephrine HCl 10 mg . . . . . . . . . . . . . . . . . . Nasal decongestant

**Uses**
- temporarily relieves these symptoms due to hay fever (allergic rhinitis) or other upper respiratory allergies:
  - runny nose
  - sneezing
  - itching of the nose or throat
  - itchy, watery eyes
  - sinus congestion and pressure
  - nasal congestion

**Warnings**
**Do not use** if you are now taking a prescription monoamine oxidase inhibitor (MAOI) (certain drugs for depression, psychiatric or emotional conditions, or Parkinson's disease), or for 2 weeks after stopping the MAOI drug. If you do not know if your prescription drug contains an MAOI, ask a doctor or pharmacist before taking this product.

**Ask a doctor before use if you have**
- high blood pressure
- heart disease
- thyroid disease
- diabetes
- glaucoma
- difficulty in urination due to enlargement of the prostate gland
- a breathing problem such as emphysema or chronic bronchitis

**Ask a doctor or pharmacist before use if you are** taking sedatives or tranquilizers.

**When using this product**
- do not exceed recommended dosage
- excitability may occur, especially in children

**Drug Facts** (continued)
- drowsiness may occur
- avoid alcoholic beverages
- alcohol, sedatives and tranquilizers may increase drowsiness
- use caution when driving a motor vehicle or operating machinery

**Stop use and ask a doctor if**
- nervousness, dizziness, or sleeplessness occur
- symptoms do not improve within 7 days or occur with a fever

**If pregnant or breast-feeding,** ask a health professional before use.
**Keep out of reach of children.** In case of overdose, get medical help or contact a Poison Control Center right away.

**Directions**
- adults and children 12 years and over: take 1 tablet every 4 hours. Do not take more than 6 tablets in 24 hours.
- children under 12 years: do not use

**Other information**
- TAMPER EVIDENT: DO NOT USE IF OUTER PACKAGE IS OPENED OR BLISTER IS TORN OR BROKEN
- store at 25°C (77°F); excursions permitted between 15°-30°C (59°-86°F)
- see end flap for expiration date and lot number

**Inactive ingredients** croscarmellose sodium, lactose anhydrous, magnesium stearate, microcrystalline cellulose, silicon dioxide, stearic acid

**Questions or comments?** 1-800-426-9391

6

7.     The CVS Health Daytime and Nighttime Severe Cold/Flu Relief; Mucus Relief

Sinus Severe Congestion & Pain;  Daytime and Nighttime Sinus Relief; Congestion & Headache;

Cold, Flu & Sore Throat; Severe Allergy & Sinus Headache; Multi-Symptom Cold Relief; and

Sinus PE Pressure + Pain products have similar labels, with similar claims, and also falsely tout

"MAXIMUM STRENGTH" as to the second active ingredient, acetaminophen, as a pain

reliever/fever reducer:





## Drug Facts

### Active ingredients
(in each 30 mL)                    **Purpose**

Acetaminophen 650 mg.........................Pain reliever/fever reducer
Dextromethorphan HBr 20 mg...........................Cough suppressant
Doxylamine succinate 12.5 mg...................................Antihistamine
Phenylephrine HCl 10 mg................................Nasal decongestant

**Uses** temporarily relieves common cold/flu symptoms:
- sinus congestion and pressure
- nasal congestion
- minor aches and pains
- headache
- runny nose and sneezing
- sore throat
- cough to help you sleep
- fever
- cough due to minor throat and bronchial irritation
- reduces swelling of nasal passages
- promotes nasal and/or sinus drainage
- temporarily restores freer breathing through the nose

### Warnings
**Liver warning:** This product contains acetaminophen. Severe liver damage may occur if you take
- more than 4,000 mg of acetaminophen in 24 hours
- with other drugs containing acetaminophen
- 3 or more alcoholic drinks every day while using this product

**Allergy alert:** Acetaminophen may cause severe skin reactions. Symptoms may include: ■ skin reddening ■ blisters ■ rash If a skin reaction occurs, stop use and seek medical help right away.
**Sore throat warning:** If sore throat is severe, persists for more than 2 days, is accompanied or followed by fever, headache, rash, nausea, or vomiting, consult a doctor promptly.

**Do not use** ■ with any other drug containing acetaminophen (prescription or nonprescription). If you are not sure whether a drug contains acetaminophen, ask a doctor or pharmacist.
- if you are now taking a prescription monoamine oxidase inhibitor (MAOI) (certain drugs for depression, psychiatric, or emotional conditions, or Parkinson's disease), or for 2 weeks after stopping the MAOI drug. If you do not know if your prescription drug contains an MAOI, ask a doctor or pharmacist before taking this product.
- if you have ever had an allergic reaction to this product or any of its ingredients

**Ask a doctor before use if you have** ■ diabetes
- liver disease
- heart disease
- high blood pressure
- thyroid disease
- glaucoma
- a sodium-restricted diet
- cough that occurs with too much phlegm (mucus)
- a breathing problem such as emphysema or chronic bronchitis
- trouble urinating due to an enlarged prostate gland
- persistent or chronic cough as occurs with smoking, asthma, or emphysema ▶

## Drug Facts (continued)

**Ask a doctor or pharmacist before use if you are**
- taking sedatives or tranquilizers
- taking the blood thinning drug warfarin

**When using this product**
- do not use more than directed
- excitability may occur, especially in children
- marked drowsiness may occur
- avoid alcoholic drinks
- be careful when driving a motor vehicle or operating machinery
- alcohol, sedatives, and tranquilizers may increase drowsiness

**Stop use and ask a doctor if**
- you get nervous, dizzy or sleepless
- pain, nasal congestion, or cough gets worse or lasts more than 7 days
- fever gets worse or lasts more than 3 days
- redness or swelling is present
- new symptoms occur
- cough comes back or occurs with rash or headache that lasts. These could be signs of a serious condition.

**If pregnant or breast-feeding,** ask a health professional before use.
**Keep out of reach of children. Overdose warning:** In case of overdose, get medical help or contact a Poison Control Center right away (1-800-222-1222). Quick medical attention is critical for adults as well as for children even if you do not notice any signs or symptoms.

### Directions
- take only as directed – see Overdose warning
- only use the dose cup provided
- do not exceed 4 doses per 24 hrs

| adults & children 12 yrs & over | 30 mL every 4 hrs |
| children 4 to under 12 yrs | ask a doctor |
| children under 4 yrs | do not use |

### Other information
- **each 30 mL contains:** sodium 44 mg
- store at 20-25°C (68-77°F)

### Inactive ingredients
alcohol, anhydrous citric acid, D&C yellow #10, edetate disodium, FD&C green #3, FD&C yellow #6, flavor, glycerin, propylene glycol, purified water, saccharin sodium, sodium benzoate, sodium chloride, sodium citrate, sorbitol solution, sucralose

**Questions or comments?** 1-800-719-9260



## Drug Facts

### Active ingredients (in each caplet) — Purpose

Acetaminophen 325 mg.....................Pain reliever
Guaifenesin 200 mg................................Expectorant
Phenylephrine HCl 5 mg............. Nasal decongestant

### Uses
temporarily relieves: ■ headache ■ nasal congestion ■ minor aches and pains ■ sinus congestion and pressure
- promotes nasal and/or sinus drainage
- helps loosen phlegm (mucus) and thin bronchial secretions to rid the bronchial passageways of bothersome mucus and make coughs more productive

### Warnings
**Liver warning:** This product contains acetaminophen. Severe liver damage may occur if you take
- more than 12 caplets in 24 hours, which is the maximum daily amount
- with other drugs containing acetaminophen
- 3 or more alcoholic drinks daily while using this product

**Allergy alert:** Acetaminophen may cause severe skin reactions. Symptoms may include:
- skin reddening ■ blisters ■ rash

If a skin reaction occurs, stop use and seek medical help right away.

**Do not use**
- with any other drug containing acetaminophen (prescription or nonprescription). If you are not sure whether a drug contains acetaminophen, ask a doctor or pharmacist.
- if you are now taking a prescription monoamine oxidase inhibitor (MAOI) (certain drugs for depression, psychiatric, or emotional conditions, or Parkinson's disease), or for 2 weeks after stopping the MAOI drug. If you do not know if your prescription drug contains an MAOI, ask a doctor or pharmacist before taking this product.

**Ask a doctor before use if you have** ■ diabetes ■ liver disease ■ heart disease ■ high blood pressure ■ thyroid disease ■ trouble urinating due to an enlarged prostate gland ■ cough that occurs with too much phlegm (mucus) ▶

## Drug Facts (continued)

- persistent or chronic cough such as occurs with smoking, asthma, chronic bronchitis, or emphysema

**Ask a doctor or pharmacist before use if you are** taking the blood thinning drug warfarin

**When using this product do not use more than directed**

**Stop use and ask a doctor if**
- nervousness, dizziness, or sleeplessness occur
- pain, nasal congestion, or cough gets worse or lasts more than 7 days
- fever gets worse or lasts more than 3 days
- redness or swelling is present
- new symptoms occur
- cough comes back or occurs with rash or persistent headache

These could be signs of a serious condition.

**If pregnant or breast-feeding,** ask a health professional before use.

**Keep out of reach of children.**

**Overdose warning:** Taking more than the recommended dose (overdose) may cause liver damage. In case of overdose, get medical help or contact a Poison Control Center right away (1-800-222-1222). Quick medical attention is critical for adults as well as for children even if you do not notice any signs or symptoms.

### Directions
■ do not take more than directed (see Overdose warning)
- do not take more than 12 caplets in any 24-hour period
- adults and children 12 years and older: take 2 caplets every 4 hours
- children under 12 years of age: do not use

### Other information
- store between 20-25°C (68-77°F) in a dry place
- retain outer package for complete product information

### Inactive ingredients
colloidal silicon dioxide, croscarmellose sodium, crospovidone, FD&C red #40 aluminum lake, FD&C yellow #6 aluminum lake, magnesium stearate, maltodextrin, microcrystalline cellulose, polyethylene glycol, polyvinyl alcohol, povidone, pregelatinized starch, stearic acid, talc, titanium dioxide ▶





11





 **CVS Health.**

Compare to the active ingredients in
Maximum Strength Mucinex® Fast-Max®
Cold, Flu & Sore Throat*

NDC 69842-616-16

**MAXIMUM STRENGTH**

# Cold, Flu & Sore Throat

**Fast Dissolving SoftGels**

**ACETAMINOPHEN** - 325 mg Pain reliever / Fever reducer

**DEXTROMETHORPHAN HBr** - 10 mg Cough suppressant

**GUAIFENESIN** - 200 mg Expectorant

**PHENYLEPHRINE HCl** - 5 mg Nasal decongestant

- Controls cough
- Relieves nasal & chest congestion, headache & fever
- Thins & loosens mucus



**FOR AGES 12+**
Actual Size

**16 SOFTGELS†** (†Liquid-filled capsules)

13

## Drug Facts

### Active ingredients (in each softgel) — *Purposes*

Acetaminophen 325 mg . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **Pain reliever/fever reducer**
Dextromethorphan HBr 10 mg . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Cough suppressant
Guaifenesin 200 mg . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Expectorant
Phenylephrine HCl 5 mg . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Nasal decongestant

### Uses

■ temporarily relieves these common cold and flu symptoms:   ■ nasal congestion   ■ headache   ■ cough
   ■ minor aches & pains   ■ sore throat   ■ sinus congestion and pressure
■ temporarily reduces fever
■ helps loosen phlegm (mucus) and thin bronchial secretions to rid the bronchial passageways of bothersome
mucus and make coughs more productive.

### Warnings

**Liver warning:** This product contains acetaminophen. Severe liver damage may occur if you take:
■ more than 12 softgels in 24 hrs, which is the maximum daily amount
■ with other drugs containing acetaminophen   ■ 3 or more alcoholic drinks every day while using this product
**Allergy alert:** Acetaminophen may cause severe skin reactions. Symptoms may include:
■ Skin reddening   ■ Blisters   ■ Rash   If a skin reaction occurs, stop use and seek medical help right away
**Sore throat warning:** If sore throat is severe, persists for more than 2 days, is accompanied or followed by
fever, headache, rash, nausea, or vomiting, consult a doctor promptly.

**Do not use**   ■ with any other drug containing acetaminophen (prescription or nonprescription). If you are not
sure whether a drug contains acetaminophen, ask a doctor or pharmacist.   ■ if you are now taking a
prescription monoamine oxidase inhibitor (MAOI) (certain drugs for depression, psychiatric or emotional
conditions, or Parkinson's disease), or for 2 weeks after stopping the MAOI drug. If you do not know if your
prescription drug contains an MAOI, ask a doctor or pharmacist before taking this product.

**Ask a doctor before use if you have**   ■ liver disease   ■ heart disease   ■ diabetes
■ high blood pressure   ■ thyroid disease   ■ trouble urinating due to enlarged prostate gland
■ persistent or chronic cough such as occurs with smoking, asthma, chronic bronchitis, or emphysema
■ cough that occurs with too much phlegm (mucus)

**Ask a doctor or pharmacist before use if you are** taking the blood thinning drug warfarin.

**When using this product, do not use more than directed.**

**Stop use and ask a doctor if**   ■ nervousness, dizziness, or sleeplessness occur
■ pain, nasal congestion, or cough gets worse or lasts more than 7 days
■ fever gets worse or lasts more than 3 days   ■ redness or swelling is present   ■ new symptoms occur
■ cough comes back, or occurs with fever, rash, or headache that lasts. These could be signs of a serious condition.

**If pregnant or breast-feeding,** ask a health professional before use.
**Keep out of reach of children.**
**Overdose warning:** Taking more than the recommended dose (overdose) may cause liver damage. In case of
overdose, get medical help or contact a Poison Control Center right away (1-800-222-1222). Quick medical
attention is critical for adults as well as for children even if you do not notice any signs or symptoms.   ➡



## Drug Facts

**KEEP OUTER PACKAGE FOR COMPLETE PRODUCT INFORMATION**

### Active ingredients (in each caplet) — Purpose

| | |
|---|---|
| Acetaminophen 325 mg | Pain reliever |
| Diphenhydramine HCl 25 mg | Antihistamine |
| Phenylephrine HCl 5 mg | Nasal decongestant |

### Uses
■ temporarily relieves these symptoms of hay fever or other upper respiratory allergies:
■ nasal congestion   ■ sneezing   ■ runny nose
■ sinus congestion and pressure   ■ itchy, watery eyes
■ itching of the nose or throat   ■ headache   ■ minor aches and pains

### Warnings
**Liver warning:** This product contains acetaminophen. Severe liver damage may occur if you take:
■ more than 4,000 mg in 24 hours, which is the maximum daily amount   ■ with other drugs containing acetaminophen
■ 3 or more alcoholic drinks every day while using this product
**Allergy alert:** Acetaminophen may cause severe skin reactions. Symptoms may include:
■ skin reddening   ■ blisters   ■ rash
If a skin reaction occurs, stop use and seek medical help right away.

**Do not use**
■ with any other drug containing acetaminophen (prescription or nonprescription). If you are not sure whether a drug contains acetaminophen, ask a doctor or pharmacist.
■ with any other product containing diphenhydramine, even one used on skin
■ if you are now taking a prescription monoamine oxidase inhibitor (MAOI) (certain drugs for depression, psychiatric or emotional conditions, or Parkinson's disease), or for 2 weeks after stopping the MAOI drug. If you do not know if your prescription drug contains an MAOI, ask a doctor or pharmacist before taking this product.
■ if you have ever had an allergic reaction to this product or any of its ingredients ➡

## Drug Facts (continued)

**Ask a doctor before use if you have**
■ glaucoma   ■ heart disease   ■ high blood pressure
■ difficulty in urination due to enlargement of the prostate gland
■ a breathing problem such as emphysema or chronic bronchitis   ■ liver disease   ■ thyroid disease   ■ diabetes

**Ask a doctor or pharmacist before use if you are**
■ taking the blood thinning drug warfarin
■ taking sedatives or tranquilizers

**When using this product**
■ do not exceed recommended dosage
■ excitability may occur, especially in children
■ marked drowsiness may occur
■ alcohol, sedatives, and tranquilizers may increase drowsiness
■ use caution when driving a motor vehicle or operating machinery   ■ avoid alcoholic beverages

**Stop use and ask a doctor if**
■ nervousness, dizziness, or sleeplessness occur
■ pain or nasal congestion gets worse or lasts more than 7 days
■ fever gets worse or lasts more than 3 days
■ redness or swelling is present   ■ new symptoms occur

**If pregnant or breast-feeding,** ask a health professional before use.
**Keep out of reach of children.** In case of accidental overdose, get medical help or contact a Poison Control Center (1-800-222-1222) right away. Prompt medical attention is critical for adults as well as for children even if you do not notice any signs or symptoms.

### Directions   ■ do not use more than directed
■ adults and children 12 years and over
■ take 2 caplets every 4 hours
■ do not take more than 10 caplets in 24 hours
■ children under 12 years: ask a doctor

### Other information
■ see end flap for expiration date and lot number ⬇

16







8.     The Products are marketed as maximum strength relief as nasal decongestants and pain reliever/fever reducer for Sinus Pressure, Sinus Headache, Sinus Pain, Sinus Congestion, Nasal Congestion, Fever Reducer, Sore Throat, Minor Aches and Pains, and Headache.

9.     Reasonable consumers understand the Maximum Strength Representations to mean that the Products are the strongest over-the-counter nasal decongestant and pain reliever/fever reducer.

10.     Therefore, CVS's labeling of the Products with a Maximum Strength Representation misleads reasonable consumers as CVS knew the active nasal decongestant ingredient, PE, was not as strong as other over-the-counter oral nasal decongestants available to consumers and, therefore, not suitable for a maximum strength representation. Additionally, the Products do not even contain the maximum dosage of acetaminophen and are thus not deserving of the "MAXIMUM STRENGTH" label and representation.

11.     Thus, the maximum strength packaging is misleading because nasal decongestants that are actually stronger—without the maximum strength claim—are available over-the-counter. For example, both oxymetazoline and pseudoephedrine are available over-the-counter.

12.     Further, CVS knew higher doses of acetaminophen exist on the market. The Court need look no further than the common manufacturing and marketing of acetaminophen products as "Regular Strength" for 325 mg and "Extra Strength" for 500 mg softgels and caplets, taken, as with the Products, in dosages of two each. For syrup/liquid Products at issue, the dosage is 650 mg.

13.     Despite this knowledge, CVS chose to mislead consumers through its labeling of the Products, with and without acetaminophen, as "MAXIMUM STRENGTH" decongestants and/or pain relievers/fever reducers. However, none of the Products are maximum strength.

Consumers, including Plaintiff, lack the scientific knowledge necessary to determine whether the Products are maximum strength decongestants and pain relievers/fever reducers, or to ascertain the true quality or strength of these Products. For that reason, reasonable consumers must and do rely on manufacturers, like CVS, to be honest and transparent and to properly disclose on the packaging all material information regarding the Products and strength.

14.     Rather than being honest and transparent, CVS makes the Maximum Strength Representation in a knowingly false, misleading, and deceptive manner.

15.     For all the reasons set forth herein, including, but not limited to, CVS's misrepresentations and omissions regarding its maximum strength claims, Plaintiffs seek relief in this action individually, and as a class action on behalf of similarly situated purchasers of CVS's Products, for: (1) violation of State consumer protection laws; (2) unjust enrichment, and (3) breach of express and implied warranties.

## THE PARTIES

16.     Plaintiff Nitto is a citizen of Illinois, residing in the Village of Grayslake, within Lake County. She purchased CVS Health Non-Drowsy Nasal Decongestant PE several times within the applicable statute of limitations period, most recently within the last ten months in 2023.

17.     Plaintiff Donald Krist is a citizen of Illinois, residing in Hanover Park, within Cook County. He purchased CVS Health Daytime and Nighttime Sinus Relief, several times within the applicable statute of limitations period, most recently in December of 2022.

18.     CVS is a Rhode Island corporation, with its principal place of business and headquarters located at One CVS Drive, Woonsocket, RI 02895. As such, Defendant is a resident and citizen of Rhode Island. CVS markets, distributes, and sells the Products to consumers throughout the United States through its brick-and-mortar locations and online through

20

Defendant's website.

## JURISDICTION AND VENUE

18.     This Court has personal jurisdiction over CVS in this matter. The acts and omissions giving rise to this action occurred in the state of Illinois. CVS has been afforded due process because it has, at all times relevant to this matter, individually or through its agents, subsidiaries, officers and/or representatives, operated, conducted, engaged in and carried on a business venture in this state and/or maintained an office or agency in this state, and/or marketed, advertised, distributed, sold and/or placed the Products into the stream of commerce directed at this state, committed a statutory violation within this state related to the allegations made herein, and caused injuries to Plaintiffs and putative class members, which arose out of the acts and omissions that occurred in the state of Illinois, during the relevant time period, at which time CVS was engaged in business activities in the state of Illinois.

19.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.§ 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more putative class members, (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one Plaintiff and CVS are citizens of different states.

20.     Pursuant to 28 U.S.C. § 1391(a), venue is proper because Plaintiffs reside in this District, purchased the Product in this District, a substantial part of the events giving rise to the claims asserted occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because CVS conducts substantial business in this District, has sufficient minimum contacts with this District, and otherwise purposely avails itself of the markets in this District, through the promotion, sale, and marketing of the Products in this District.

## FACTS COMMON TO ALL CLASS MEMBERS

21.     CVS is one of the largest pharmacy companies in the world. As such, CVS sells several over-the-counter drugs, including its own "CVS Health" branded line of products.

22.     PE is the oral active ingredient in the Products for nasal decongestion. Acetaminophen is the active ingredient in the Products that are the subject of this action as pain reliever/fever reducer. When included, both form the basis for CVS's Maximum Strength Representation on the Products' packaging, and overall advertising and marketing campaign.

23.     At all relevant times, CVS has marketed the Products in a consistent and uniform manner nationwide.

24.     As alleged above, the Products represent that they are "MAXIMUM STRENGTH," which representations prominently appear on the front label of the Products in capitalized bold lettering that contrast with the background of the packaging. This instantly catches the eye of all reasonable consumers, including Plaintiffs and class members.

25.     A reasonable consumer would understand that "MAXIMUM STRENGTH" means the Products contained the strongest nasal decongestant available on the over-the-counter market, as well as the strongest dose of acetaminophen for pain reliever/fever reducer, where applicable.

26.     All reasonable consumers, including Plaintiffs, read and relied on CVS's "MAXIMUM STRENGTH" representations when purchasing the Products. Indeed, when purchasing pharmaceuticals, especially those promising to be maximum strength, consumers look for a product with the strongest active ingredients available and are willing to pay a premium for them.

27.     CVS's Maximum Strength Representation was material to Plaintiffs and class members' decision to purchase the Products. Had consumers, such as Plaintiffs, known the

Products were not "MAXIMUM STRENGTH," because stronger over-the-counter alternatives existed, they would not have purchased the Products or would have paid less.

28.     CVS's marketing efforts are made in order to—and do in fact—induce consumers to purchase the Products at a premium because consumers believe they are getting maximum strength decongestants. This deceives reasonable consumers into believing PE nasal decongestants are maximum strength when they are not.

29.     CVS, however, has at all relevant times been well aware that its Products are not maximum strength nasal decongestants, as other, stronger nasal decongestants are available with stronger active ingredients, such as pseudoephedrine, over-the-counter.

30.     Reliable scientific studies undermine PE's effectiveness when compared to other nasal decongestants, thus rendering its Maximum Strength Representation false and misleading in the face of such evidence, and no reasonable consumer would deem the Products maximum strength.

31.     Regardless of a handful of clinical studies addressing PE's efficacy, PE's effectiveness has been questioned when compared to other over-the-counter nasal decongestants.

32.     "Intervention studies can be placed on a continuum, with a progression from efficacy trials to effectiveness trials. Efficacy can be defined as the performance of an intervention under ideal and controlled circumstances, whereas effectiveness refers to its performance under 'real world' conditions."[3]

33.     Further, comparative studies in drugs are designed to improve the health care decisions by providing evidence regarding effectiveness, benefits, and harms of different

---

[3] *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3912314/. Last visited Jan. 12, 2024.

treatments.[4]

34.     In 2006, the authors of a research comparative letter to the editor of a scientific journal found pseudoephedrine superior to PE in reducing nasal congestion, attributing the ineffectiveness to poor bioavailability of PE.[5]

35.     Also, in 2009, a comparison effectiveness study was done on PE and pseudoephedrine. The authors found that pseudoephedrine was far more effective on the measures of nasal congestion than PE.[6]

36.     Further, the Maximum Strength Representation on the Products' labels is misleading for yet another reason. The only active ingredient for pain relief/fever reducer is 650 mg of acetaminophen per dose, which is the equivalent of a "Regular Strength" acetaminophen tablet or syrup/liquid. Thus, the strength of the acetaminophen dosage is far below anything that can be considered "MAXIMUM STRENGTH," or as acetaminophen is commonly marketed as "Extra Strength."

37.     CVS intended for Plaintiffs and class members to be deceived or misled by its misrepresentations and omissions. Indeed, label space is limited, so manufacturers only place the most pertinent information on the front label. CVS specifically labeled and marketed the Products as Maximum Strength when other oral nasal decongestants and pain relievers/fever reducers were not marketed in a similar fashion.

38.     CVS's deceptive and misleading practices proximately caused harm to Plaintiffs

---

[4] *See*       https://tracs.unc.edu/index.php/services/comparative-effectiveness-research/what-is-cer#:~:text=Comparative%20effectiveness%20research%20is%20designed,harms%20of%20different%20treatment%20options. Last visited Jan. 12, 2024.
[5]     *See*   https://www.jacionline.org/action/showPdf?pii=S0091-6749%2806%2900633-6.   Last visited Jan. 12, 2024.
[6] *See* https://pubmed.ncbi.nlm.nih.gov/19230461/. Last visited Jan. 12, 2024.

and the Classes.

39.    Plaintiffs and class members would not have purchased the Products, or would have paid less for them, had they known the truth about the mislabeled and falsely advertised Products. Indeed, other, stronger nasal decongestants and higher acetaminophen doses are available.

## PLAINTIFFS' FACTUAL ALLEGATIONS

40.    Plaintiffs relied on the "MAXIMUM STRENGTH" label in deciding to purchase what she believed to be the strongest available nasal decongestant over-the-counter. Had Plaintiffs known that PE, the only active oral nasal decongestant ingredient in the Products, is not the maximum strength nasal decongestant available over-the-counter, they would not have purchased it or would have paid less. Further, had they known the acetaminophen in the Products was not the maximum dosage available, they would not have purchased it or would have paid less.

41.    Plaintiff Nitto resides in the Village of Grayslake, Illinois and is a citizen of Illinois. Throughout the relevant period, Plaintiff Nitto purchased the Products at issue in this lawsuit and was exposed to and reasonably relied upon CVS's "MAXIMUM STRENGTH" representations. For example, Plaintiff Nitto purchased CVS Non-Drowsy Nasal Decongestant PE from a local CVS located at 34344 N US Highway 45, Third Lake, Illinois 60030, several times within the applicable statute of limitations period, most recently within the last ten months in 2023. Upon purchase, Plaintiff Nitto reviewed the Product packaging, including the front-label representations, and reasonably believed from these representations that the Products were "MAXIMUM STRENGTH." Those terms meant to Plaintiff Nitto that no stronger alternative over-the-counter nasal decongestant existed. In reasonable reliance on these representations, Plaintiff Nitto paid a premium cost for the Product, which were worth less than represented because the statements were not true and were highly misleading. The Maximum Strength Representation on the Product

packaging was part of the basis of the bargain in that Plaintiff Nitto attributed value to those representations and Plaintiff Nitto would not have purchased the Products, or would not have purchased them on the same terms, if she knew the Maximum Strength Representation was untrue and/or misleading. Plaintiff Nitto paid a price premium for empty promises that CVS did not keep. Had Plaintiff Nitto been aware that the Maximum Strength Representation made by CVS on the Products was untrue, she would have paid less for the Products, or would not have purchased them at all.

42. Plaintiff Krist resides in Hanover Park, Illinois and is a citizen of Illinois. Throughout the relevant period, Plaintiff Krist purchased the Products at issue in this lawsuit and was exposed to and reasonably relied upon CVS's "MAXIMUM STRENGTH" representations. For example, Plaintiff Krist purchased CVS Health Daytime and Nighttime Sinus Relief from a local CVS located at 1855 W Irving Park Rd, Schaumburg, IL 60193, several times within the applicable statute of limitations period, most recently in December of 2022. Upon purchase, Plaintiff Krist reviewed the Product packaging, including the front-label representations, and reasonably believed from these representations that the Products were "MAXIMUM STRENGTH." Those terms meant to Plaintiff Krist that no stronger alternative over-the-counter nasal decongestant existed. In reasonable reliance on these representations, Plaintiff Krist paid a premium cost for the Product, which were worth less than represented because the statements were not true and were highly misleading. The Maximum Strength representation on the Product packaging, was part of the basis of the bargain in that Plaintiff Krist attributed value to those representations and Plaintiff Krist would not have purchased the Products, or would not have purchased them on the same terms, if he knew the Maximum Strength Representation was untrue and/or misleading. Plaintiff Krist paid a price premium for empty promises that CVS did not keep.

Had Plaintiff Krist been aware that the Maximum Strength Representation made by CVS on the Products was untrue, he would have paid less for the Products, or would not have purchased them at all.

### FED. R. CIV. P. 9(B) ALLEGATIONS

43.     CVS made material misrepresentations and/or omissions of fact in its labeling and marketing of the Products by representing that they are "MAXIMUM STRENGTH" decongestant and pain relief/fever reducer products.

44.     CVS's alleged conduct was and continues to be fraudulent because it has the effect of deceiving consumers into believing the Products are maximum strength oral nasal decongestant products. CVS omitted from Plaintiffs and class members that the Products are not maximum strength oral nasal decongestant products because other stronger over-the-counter nasal decongestant products exist. CVS knew or should have known this information is material to all reasonable consumers and impacts consumers' purchasing decisions. Yet, CVS has and continues to represent the Products are maximum strength oral nasal decongestant products when they are not and has omitted from the Products' packaging the fact that there are other over-the-counter products that are stronger decongestants. CVS has likewise continued to label the Products as maximum strength with respect to pain relief/fever reducer, even though the Products' acetaminophen content is only regular strength.

45.     CVS made material misrepresentations and/or omissions detailed herein, including that the Products are maximum strength oral nasal decongestant and pain reliever/fever reducer, continuously throughout the applicable class period(s).

46.     CVS's material misrepresentations and omissions, that the Products are maximum strength oral nasal decongestant and pain reliever/fever reducer products, were located on the front

label of the Products in capitalized, bold lettering that contrasts with the background of the packaging, which instantly catches the eye of all reasonable consumers, including Plaintiffs and class members, at the point of sale in every transaction. The Products are sold in brick-and-mortar stores and online stores in Illinois and nationwide.

47.     CVS made written misrepresentations of fact on the front label of the Products that they were "MAXIMUM STRENGTH" even though other stronger nasal decongestant and pain reliever/fever reducer products are available. As such, CVS's Maximum Strength Representations are false and misleading. Moreover, CVS omitted from the Products' labeling the fact that there are stronger over-the-counter nasal decongestants and pain relievers/fever reducers available. And as alleged in detail throughout this Amended Complaint, Plaintiffs and class members read and relied on CVS's Maximum Strength Representations and omissions before purchasing the Products.

48.     CVS misrepresented its Products as being maximum strength nasal decongestant and pain reliever/fever reducer and omitted from the Products' labeling the fact that there are other, over-the-counter products available that are stronger decongestants and pain relievers/fever reducers, for the express purpose of inducing Plaintiffs and class members to purchase the inferior PE and acetaminophen Products at a price premium. As such, CVS profited by selling the misrepresented Products to at least thousands of consumers throughout the nation.

## CLASS ACTION ALLEGATIONS

49.     Plaintiffs bring this action on behalf of themselves and the following "Classes" pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and/or (b)(3). Specifically, the Classes are defined as:

> **Nationwide Class**: All persons in the United States who purchased one or more of the Products in the United States for personal use and not for resale during the

applicable statute of limitations period, until the date notice is disseminated.

**Illinois Subclass**: All persons in the State of Illinois who purchased one or more of the Products in the State of Illinois for personal use and not for resale during the applicable statute of limitations period, until the date notice is disseminated.

**Multi-State Consumer Protection Class:** All persons who purchased in the State of Illinois or any state with similar laws[7] one or more of the Products, within the applicable statute of limitations, until the date notice is disseminated.

50.     Excluded from the Classes are (a) any person who purchased the Products for resale and not for personal or household use, (b) any person who signed a release of CVS in exchange for consideration, (c) any officers, directors or employees, or immediate family members of the officers, directors or employees, of CVS or any entity in which a CVS has a controlling interest, (d) any legal counsel or employee of legal counsel for CVS, and (e) the presiding Judge in this lawsuit, as well as the Judge's staff and their immediate family members.

51.     Plaintiffs reserve the right to amend the definition of the Classes if discovery or further investigation reveals that the Classes should be expanded or otherwise modified.

52.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** Class members are so numerous and geographically dispersed that joinder of all class members is impracticable. While the exact number of class members remains unknown at this time, upon information and belief, there are thousands, if not hundreds of thousands or millions, of putative class members.

53.     **Predominance of Common Questions of Law and Fact – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all class members

---

[7] While discovery may alter the following, Plaintiffs assert that the other states with similar consumer fraud laws under the facts of this case include, but are not limited to: California (Cal. Bus. & Prof. Code § 17200*, et seq*.); Florida (Fla. Stat. §§ 501.201, *et seq*.); Illinois (815 ICLS §§ 505/1, *et seq*.); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq*.); Michigan (Mich. Comp. Laws §§ 445.901, *et seq*.); Minnesota (Minn. Stat. §§ 325F.67, *et seq*.); New Jersey (N.J. Stat. §§ 56:8-1, *et seq*.); New York (N.Y. Gen. Bus. Law §§ 349, *et seq*.); Washington (Wash. Rev. Code §§ 19.86.010, *et seq*.); *See Mullins v. Direct Digital, LLC*, No. 13-cv-1829, 2014 WL 5461903 (N.D. Ill. Sept. 30, 2014), *aff'd*, 795 F.3d 654 (7th Cir. 2015).

and predominate over any questions affecting only individual class members. These common legal and factual questions include, but are limited to, the following:

   a. Whether CVS made the "MAXIMUM STRENGTH" representations;

   b. Whether CVS promoted the Products with false and misleading statements of fact and material omissions;

   c. Whether CVS's "MAXIMUM STRENGTH" representations are deceptive, unfair, or misleading to the reasonable consumer;

   d. Whether CVS's actions and/or omissions violate applicable laws;

   e. Whether Plaintiffs and putative members of the Classes have suffered loss of monies or property or other value as a result of CVS's acts, omissions, or misrepresentations of material facts;

   f. Whether CVS was unjustly enriched at the expense of Plaintiffs and members of the putative Classes in connection with the Products;

   g. Whether CVS breached warranties owed to Plaintiffs and members of the putative Classes;

   h. Whether Plaintiffs and members of the putative Classes are entitled to monetary damages and, if so, the nature of such relief; and

   i. Whether Plaintiffs and members of the putative Classes are entitled to equitable, declaratory, or injunctive relief and, if so, the nature of such relief.

54. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of those of the absent class members in that Plaintiffs and the class members each purchased and used the Products and each sustained damages arising from CVS's wrongful conduct, as alleged more fully herein. Plaintiffs share the aforementioned facts and legal claims or questions

with putative members of the Classes, and Plaintiffs and all members of the putative Classes have been similarly affected by CVS's common course of conduct alleged herein. Plaintiffs and all members of the putative Classes sustained monetary and economic injuries including, but not limited to, ascertainable loss arising out of CVS's false and deceptive "MAXIMUM STRENGTH" representations about the Products, as alleged herein.

55. **Adequacy – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs will fairly and adequately represent and protect the interests of the members of the putative Classes. Plaintiffs have retained counsel with substantial experience in handling complex class action litigation, including complex questions that arise in this type of consumer protection litigation. Further, Plaintiffs and their counsel are committed to the vigorous prosecution of this action. Plaintiffs do not have any conflicts of interest or interests adverse to those of putative Classes.

56. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** CVS has acted or refused to act on grounds generally applicable to Plaintiffs and all members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole.

57. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available methods for the fair and efficient adjudication of the present controversy for at least the following reasons:

    a. The damages suffered by each individual member of the putative Classes do not justify the burden and expense of individual prosecution of the complex and extensive litigation necessitated by CVS's conduct;

    b. Even if individual members of the Classes had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual

litigation would proceed;

c. The claims presented in this case predominate over any questions of law or fact affecting individual members of the Classes;

d. Individual joinder of all members of the Classes is impracticable;

e. Absent a class, Plaintiffs and members of the putative Classes will continue to suffer harm as a result of CVS's unlawful conduct; and

f. This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiffs and members of the putative Classes can seek redress for the harm caused by CVS.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF ILLINOIS CONSUMER FRAUD
### AND DECEPTIVE BUSINESS PRACTICES ACT
### (By Plaintiffs on Behalf of the Illinois Subclass)

58. Plaintiffs reallege paragraphs 1-57 above as if fully set forth herein.

59. The Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"), 815 ILCS 505/1, *et seq.*, prohibits "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act' . . . ."

60. Plaintiffs and the Illinois Subclass members were injured by CVS's deceptive misrepresentations, concealments and omissions and these misrepresentations, concealments and omissions were material and deceived Plaintiffs and the Illinois Subclass. Because Plaintiffs and

the Illinois Subclass members relied on CVS's misrepresentations, concealments and omissions when purchasing the Products, they were injured at the time of purchase.

61.     CVS does business in Illinois, sells and distributes the Products in Illinois, and engaged in deceptive acts and practices in connection with the sale of the Products in Illinois and elsewhere in the United States.

62.     The Products purchased by Plaintiffs and the Illinois Subclass members were "consumer items" as that term is defined under the ICFA.

63.     CVS engaged in unfair and deceptive acts in violation of 815 Ill. Comp. Stat. 505/2 when it misrepresented and deceptively concealed, suppressed and/or omitted the material information known to CVS as set forth above concerning its Products, which has caused damage and injury to Plaintiffs and the Illinois Subclass members. Plaintiffs and the Illinois Subclass members were injured by CVS's unfair and deceptive acts at the time of purchasing the Products.

64.     CVS's marking of the Products violates this prohibition by deceiving consumers into believing each of the Products is a "MAXIMUM STRENGTH" decongestant or pain reliever/fever reducer.

65.     CVS engaged in fraudulent and/or deceptive conduct, which creates a likelihood of confusion or of misunderstanding in violation of the Act.

66.     CVS engaged in misleading and deceptive advertising that represented that the Products were maximum strength. CVS chose to package and market the Products in this way to impact consumer choices and gain market dominance, as it knew or should have known that all consumers who purchased the products would be impacted by its omissions and would reasonably believe CVS's false and misleading Maximum Strength Representations and omissions.

67.     CVS's deceptive acts occurred in a course of conduct involving trade and

33

commerce in Illinois and throughout the United States.

68.     CVS intended Plaintiffs and the Illinois Subclass members to rely on its deceptive acts when purchasing the Products.

69.     CVS's deceptive acts proximately caused actual injury and damage to Plaintiffs and the Illinois Subclass members at the time of purchase.

70.     Plaintiffs and the Illinois Subclass members would not have purchased, or would have paid less for, the Products but for CVS's material misrepresentations as described in this Amended Complaint.

<u>**COUNT II**</u>
**VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(By Plaintiffs on Behalf of the Illinois Subclass)**

71.     Plaintiffs reallege paragraphs 1-57 above as if fully set forth herein.

72.     The Illinois Deceptive Trade Practices Act ("UDTPA"), 815 ILCS 510/2, *et seq*., prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact."

73.     815 ILCS 510/2 provides in pertinent part that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person does any of the following: "(5) represents that goods or services have . . . uses, benefits or quantities that they do not have . . .; (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; . . . [or] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

74.     CVS's marking of the Products violates this prohibition by deceiving consumers

into believing each of the Products is a "MAXIMUM STRENGTH" decongestant or pain reliever/fever reducer.

75.     CVS engaged in fraudulent and/or deceptive conduct, which creates a likelihood of confusion or of misunderstanding in violation of the Act.

76.     CVS engaged in misleading and deceptive advertising that represented that the Products were maximum strength. CVS chose to package and market the Products in this way to impact consumer choices and gain market dominance, as it knew or should have known that all consumers who purchased the Products would be impacted by its omissions and would reasonably believe CVS's false and misleading Maximum Strength Representations and omissions.

77.     CVS intended that Plaintiffs and each of the other Illinois Subclass members would reasonably rely upon the material omissions concerning the true nature of the Products.

78.     CVS's concealment, omissions, and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiffs and each of the other Illinois Subclass members to be deceived about the true nature of the Products.

79.     CVS's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

80.     CVS's deceptive acts proximately caused actual injury and damage to Plaintiffs and the Illinois Subclass Members at the time of purchase.

81.     Plaintiffs and the Illinois Subclass Members would not have purchased, or would have paid less for, the Products but for CVS's material misrepresentations as described in this Amended Complaint.

82.     CVS intended Plaintiffs and the Illinois Subclass members to rely on its deceptive acts when purchasing the Products.

**COUNT III**
**VIOLATION OF STATE CONSUMER PROTECTION STATUTES**
**(By Plaintiffs on Behalf of the Multi-State Consumer Protection Class)**

83.     Plaintiffs reallege paragraphs 1-57 above as if fully set forth herein.

84.     Plaintiffs and Multi-State Consumer Protection Class members have been injured as a result of CVS's violations of the state consumer protection statutes listed above in paragraph 49 and footnote 7, which also provide a basis for redress to Plaintiffs and Multi-State Consumer Class Members based on CVS's fraudulent, deceptive, unfair and unconscionable acts, practices and conduct.

85.     CVS's conduct as alleged herein violates the consumer protection, unfair trade practices, and deceptive acts laws of each of the jurisdictions encompassing the Multi-State Consumer Class.

86.     CVS violated the Multi-State Consumer Class states' consumer protection, unfair trade practices, and deceptive acts laws through its misleading and deceptive advertising that represented the Products were "MAXIMUM STRENGTH." CVS chose to package and market the Products in this way to impact consumer choices and gain market dominance, as it knew or should have known that all consumers who purchased the Products would be impacted by its omissions and would reasonably believe CVS's false and misleading Maximum Strength Representations and omissions.

87.     CVS's misrepresentations were material to Plaintiffs and Multi-State Consumer Class members' decision to purchase the Products or pay a premium for the Products.

88.     CVS made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

89.     As a result of CVS's violations of the aforementioned states' unfair and deceptive

practices laws, Plaintiffs and Multi-State Consumer Class members paid a premium for the Products.

90.     As a result of CVS's violations, CVS has been unjustly enriched.

91.     Pursuant to the alleged consumer protection, unfair trade practices, and deceptive acts laws, Plaintiffs and Multi-State Consumer Class members are entitled to recover compensatory damages, restitution, punitive and special damages, including but not limited to statutory or treble damages, reasonable attorneys' fees, and costs, and other injunctive or declaratory relief as deemed appropriate or permitted pursuant to the relevant law.

**COUNT IV**
**UNJUST ENRICHMENT**
**(By Plaintiffs, in the Alternative, and on Behalf of the Nationwide and/or Illinois Subclass)**

92.     Plaintiffs reallege paragraphs 1-57 above as if fully set forth herein.

93.     Plaintiffs bring this cause of action on behalf of themselves, the Nationwide Class, and/or the Illinois Subclass. It is alleged it the alternative to the extent there is no adequate remedy at law.

94.     Plaintiffs and the putative class members conferred a benefit on CVS when they purchased the Products. By its wrongful acts and omissions described herein, including selling the Products containing the "MAXIMUM STRENGTH" representations, which did not conform to the promises or affirmations of fact made on the label, CVS was unjustly enriched at the expense of Plaintiffs and the putative class members.

95.     Plaintiffs' and the putative class members' detriment and CVS's enrichment were related to and flowed from the wrongful conduct challenged in this Amended Complaint.

96.     CVS has profited from its unlawful, unfair, misleading, and deceptive practices at the expense of Plaintiffs and the putative class members under circumstances in which it would be unjust for CVS to be permitted to retain the benefit. It would be inequitable for CVS to retain the

profits, benefits, and other compensation obtained from their wrongful conduct as described herein in connection with selling the Products.

97.     CVS has been unjustly enriched in retaining the revenues derived from class members' purchases of the Products, which retention of such revenues under these circumstances is unjust and inequitable because CVS marketed, advertised, distributed, and sold the Products, and CVS misrepresented the nature of the Products, misrepresented their benefits and attributes, and knowingly marketed and promoted the Products with Maximum Strength Representations, which caused injuries to Plaintiffs and the Classes because they would not have purchased the Products based on the same representations if the true facts concerning the Products had been known.

98.     Plaintiffs and the putative class members have been damaged as a direct and proximate result of CVS's unjust enrichment because they would not have purchased the Products on the same terms or for the same price had they known the true nature of the Products and the misstatements regarding the strength of the Products' active ingredients.

99.     CVS either knew or should have known that payments rendered by Plaintiffs and the class members were given and received with the expectation that the Maximum Strength Representations made by CVS in advertising and on the Products' labels and packaging were true. It is inequitable for CVS to retain the benefit of payments under these circumstances because the Maximum Strength Representations are not true.

100.    Plaintiffs and the putative class members are entitled to recover from CVS all amounts wrongfully collected and improperly retained by CVS.

101.    As a direct result of CVS's wrongful conduct and unjust enrichment, Plaintiffs and the putative class members are entitled to restitution of, disgorgement of, and/or imposition

of a constructive trust upon all profits, benefits, and other compensation obtained by CVS for its inequitable and unlawful conduct.

## COUNT V
### Breach of Express Warranty
### (By Plaintiff, In the Alternative, and on Behalf of the Nationwide and/or Illinois Subclass)

102.　Plaintiffs reallege paragraphs 1-57 above as if fully set forth herein.

103.　Plaintiffs and class members purchased the Products at CVS.

104.　Plaintiffs and class members formed a contract with CVS at the time Plaintiffs and class members purchased the Products.

105.　The terms of the contract include the promises and affirmations of fact made by CVS on the Product packaging and through marketing and advertising, as described above.

106.　This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiffs and class members.

107.　CVS made the representations described herein to induce Plaintiffs and class members to purchase the Products, and Plaintiffs and class members relied on the representations in purchasing the Products.

108.　All conditions precedent to CVS's liability under the above-referenced contract have been performed by Plaintiffs and the other class members.

109.　CVS thereby breached the following state warranty laws:

a.　Code of Ala. § 7-2-313;

b.　Alaska Stat. § 45.02.313;

c.　A.R.S. § 47-2313;

d.　A.C.A. § 4-2-313;

e.　Cal. Comm. Code § 2313;

f.      Colo. Rev. Stat. § 4-2-313;

g.      Conn. Gen. Stat. § 42a-2-313;

h.      6 Del. C. § 2-313;

i.      D.C. Code § 28:2-313;

j.      Fla. Stat. § 672.313;

k.      O.C.G.A. § 11-2-313;

l.      H.R.S. § 490:2-313;

m.      Idaho Code § 28-2-313;

n.      810 I.L.C.S. 5/2-313;

o.      Ind. Code § 26-1-2-313;

p.      Iowa Code § 554.2313;

q.      K.S.A. § 84-2-313;

r.      K.R.S. § 355.2-313;

s.      11 M.R.S. § 2-313;

t.      Md. Commercial Law Code Ann. § 2-313;

u.      106 Mass. Gen. Laws Ann. § 2-313;

v.      M.C.L.S. § 440.2313;

w.      Minn. Stat. § 336.2-313;

x.      Miss. Code Ann. § 75-2-313;

y.      R.S. Mo. § 400.2-313;

z.      Mont. Code Anno. § 30-2-313;

aa.     Neb. Rev. Stat. § 2-313;

bb.     Nev. Rev. Stat. Ann. § 104.2313;

cc.   R.S.A. 382-A:2-313;

dd.   N.J. Stat. Ann. § 12A:2-313;

ee.   N.M. Stat. Ann. § 55-2-313;

ff.   N.Y. U.C.C. Law § 2-313;

gg.   N.C. Gen. Stat. § 25-2-313;

hh.   N.D. Cent. Code § 41-02-30;

ii.   II. O.R.C. Ann. § 1302.26;

jj.   12A Okl. St. § 2-313;

kk.   Or. Rev. Stat. § 72-3130;

ll.   13 Pa. Rev. Stat. § 72-3130;

mm.   R.I. Gen. Laws § 6A-2-313;

nn.   S.C. Code Ann. § 36-2-313;

oo.   S.D. Codified Laws, § 57A-2-313;

pp.   Tenn. Code Ann. § 47-2-313;

qq.   Tex. Bus. & Com. Code § 2.313;

rr.   Utah Code Ann. § 70A-2-313;

ss.   9A V.S.A. § 2-313;

tt.   Va. Code Ann. § 59.1-504.2;

uu.   Wash. Rev. Code Ann. § 6A.2-313;

vv.   W. Va. Code § 46-2-313;

ww.   Wis. Stat. § 402.313; and

xx.   Wyo. Stat. § 34.1-2-313.

110.   In connection with its sale of the Products, CVS, as the designer, manufacturer,

marketer, distributor or seller, expressly warranted that the Products were maximum strength through its use of the Maximum Strength Representations described herein.

111.   The express warranties covering the Products were a material part of the bargain between CVS and consumers. At the time it made these express warranties, CVS knew reasonable consumers were purchasing the Products because they believed they were maximum strength oral nasal decongestant products and pain relievers/fever reducers, as they were labeled and marketed.

112.   Each of the Products have an identical or substantially identical product representation(s) as they each contain the term "MAXIMUM STRENGTH" in their product name. Furthermore, the Products are marketed and advertised in an identical or substantially identical way.

113.   CVS breached its express warranties by selling the Products that were, in actuality, not maximum strength oral nasal decongestant products and pain relievers/fever reducers. CVS breached the warranty because it sold the Products which it labeled and marketed using the Maximum Strength Representations despite the fact that stronger over-the-counter alternatives existed, which was known to CVS and unknown to consumers at the time of sale.

114.   CVS further breached its express written warranties to Plaintiffs and class members in that the Products are incapable of fulfilling their promise to function as maximum strength oral nasal decongestant products and pain relievers/fever reducers at the time they leave the manufacturing plant and on the first day of purchase, and by failing to disclose and actively concealing the true benefits of the Products from consumers.

115.   The Products that Plaintiffs and class members purchased are not maximum strength oral nasal decongestant products and pain relievers/fever reducers, and thus Plaintiffs

42

and class members suffered the loss of the Product, loss of use of the Product, and loss of the benefit of their bargain. CVS's warranty expressly applies to the original purchaser, creating privity between CVS on the one hand, and Plaintiffs and class members on the other.

116.    CVS has been provided sufficient notice of its breaches of the express warranties associated with the Products in a letter dated November 27, 2023.

117.    As a direct and proximate result of CVS's breach of its express warranties, Plaintiffs and Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

**COUNT VI**
**Breach of Implied Warranty**
**(By Plaintiff, In the Alternative, and on Behalf of the Nationwide and/or Illinois Subclass)**

118.    Plaintiffs reallege paragraphs 1-57 above as if fully set forth herein.

119.    The Products are goods within the relevant laws and CVS knew or had reason to know of the specific use for which the Products, as goods, were purchased.

120.    The implied warranty of merchantability included with the sale of each Product means that CVS warranted that the Products would be fit for the ordinary purposes for which the Products were used and sold, and were not otherwise injurious to consumers, that the Products would pass without objection in the trade, be of fair and average quality, and conform to the promises and affirmations of fact made by CVS. This implied warranty of merchantability is part of the basis for the benefit of the bargain between CVS, and Plaintiffs, and class members.

121.    Defendant breached the implied warranty of merchantability because the Products are not fit for their ordinary purpose as a maximum strength nasal decongestant and pain reliever/fever reducer. As further alleged herein, stronger over-the-counter alternatives

existed, and therefore, there is a breach of the implied warranty of merchantability.

122.    CVS's warranty expressly applies to the original purchaser and any succeeding owner of the Products, creating privity between CVS on the one hand, and Plaintiffs and class members on the other.

123.    CVS impliedly warranted that the Products were of merchantable quality and fit for such use. These implied warranties included, among other things: (i) a warranty that the Products manufactured, supplied, distributed, and/or sold by CVS were maximum strength nasal decongestants and pain relievers/fever reducers; and (ii) a warranty that the Products would be fit for their intended use while they were being used by consumers.

124.    Contrary to the applicable implied warranties, the Products, at the time of sale and thereafter, were not fit for their ordinary and intended purpose of providing Plaintiffs and class members with maximum strength nasal decongestants and pain relievers/fever reducers, as other, stronger alternatives are available with stronger active ingredients, such as pseudoephedrine, and with higher acetaminophen dosages.

125.    CVS breached the implied warranties because the Products were sold with the inability to provide Plaintiffs and class members with a maximum strength nasal decongestant and pain relievers/fever reducers, which substantially reduced and/or prevented the Products from functioning as a maximum strength product.

126.    CVS has been provided sufficient notice of its breaches of the implied warranties associated with the Products in a letter dated November 27, 2023.

127.    As a direct and proximate result of the foregoing, Plaintiffs and class members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated members of the Classes, prays for relief and judgment, including entry of an order:

A.      Declaring that this action is properly maintained as a class action, certifying the proposed Classes, appointing as Class Representative and appointing Plaintiffs' counsel as Class Counsel;

B.      Directing that CVS bear the costs of any notice sent to the Classes;

C.      Declaring that CVS must disgorge, for the benefit of the Classes, all or part of the ill-gotten profits they received from the sale of the Products, or order CVS to make full restitution to Plaintiffs and the members of the Classes;

D.      Awarding restitution and other appropriate equitable relief;

E.      Granting an injunction against CVS to enjoin it from conducting its business through the unlawful, unfair, and fraudulent acts or practices set forth herein;

F.      Granting an Order requiring CVS to fully and appropriately recall the Products and/or to remove the claims on its website and elsewhere, including "MAXIMUM STRENGTH" representations regarding the Products;

G.      Ordering a jury trial and damages according to proof;

H.      Awarding Plaintiffs and members of the Classes compensatory and punitive damages, or statutory damages, as provided by the applicable state consumer protection statutes invoked above;

I.      Enjoining CVS from continuing to engage in the unlawful and unfair business acts and practices as alleged herein;

J.      Awarding attorneys' fees and litigation costs to Plaintiffs and members of

the Class(es);

     K.    Awarding civil penalties, prejudgment interest, and punitive damages as permitted by law; and

     L.    Ordering such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury of all claims in this Amended Complaint so triable.


Dated: February 2, 2024          Respectfully submitted,

                      By: */s/ Nick Suciu III*

                      Nick Suciu III
                      **MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
                      6905 Telegraph Rd., Suite 115
                      Bloomfield Hills, MI 48301
                      Telephone: (313) 303-3472
                      Email: nsuciu@milberg.com

                      Gary M. Klinger
                      **MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
                      227 W. Monroe Street, Suite 2100
                      Chicago, IL 60606
                      Telephone: (866) 252-0878
                      Email: gklinger@milberg.com

                      Jeff Ostrow
                      Jonathan M. Streisfeld
                      Kristen Lake Cardoso
                      **KOPELOWITZ OSTROW P.A.**
                      One West Las Olas Blvd., Suite 500
                      Fort Lauderdale, Florida 33301
                      Telephone: (954) 525-4100
                      Email: ostrow@kolawyers.com
                             streisfeld@kolawyers.com
                             cardoso@kolawyers.com

Melissa S. Weiner
Ryan J. Gott
**PEARSON WARSHAW, LLP**
328 Barry Avenue South, Suite 200
Wayzata, Minnesota 55391
Telephone: (612) 389-0600
Email: mweiner@pwfirm.com
        rgott@pwfirm.com

Erin Ruben
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Email: eruben@milberg.com

J. Hunter Bryson
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
405 E 50th Street
New York, NY 10022
Telephone: (630) 796-0903
Email: hbryson@milberg.com

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on February 2, 2024, the foregoing document was filed via the Court's ECF system, which will cause a true and correct copy of the same to be served electronically on all ECF-registered counsel of record.


_/s/ Nick Suciu III_
Nick Suciu III